|  |  |
|---|---|
| CATHERINE MAYS,<br><br>                Plaintiff,<br><br>    v.<br><br>KING COUNTY,<br><br>                Defendant. | CASE NO. CV07-1114-JCC<br><br>ORDER |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

This matter comes before the Court on Defendant's Motion for Summary Judgment (Dkt. No. 14), Plaintiff's Response in opposition (Dkt. No. 23), and Defendant's Reply (Dkt. No. 27), which includes within it a motion to strike. The Court has carefully considered the briefing by the parties, including all affidavits, declarations, and exhibits filed in support, together with relevant portions of the record, and has determined that oral argument is not necessary. Being fully apprised of the matter, the Court hereby rules as follows.[1]

---

[1] The analysis that follows focuses on only one of the many claims and theories that Plaintiff originally advanced in the Amended Complaint. Plaintiff concedes to dismissal of all but one claim—that for gender discrimination. (Pl.'s Resp. 2 (Dkt. No. 23).) As pled, this remaining cause of action alleges that "plaintiff was subjected by defendant to *disparate treatment* based on gender, in violation of Title VII and the [Washington State] Laws Against Discrimination[.]" (Am. Compl. ¶ 3.2 (Dkt. No. 2 at 22)) (emphasis added). However, the facts alleged in the Amended Complaint do not, on their face, support a

ORDER – 1

## I. BACKGROUND

The basis for Plaintiff Catherine Mays' hostile workplace claim is a sexual assault she suffered in May 2004 at the hands of Larry Jackson, a King County Correctional Facility ("KCCF") inmate.[2] At the time of the assault, Mays had been employed by KCCF as a registered nurse for approximately seven years and, although her job was challenging, she enjoyed it. (*See* Mays Decl. ¶¶ 1, 2 (Dkt. No. 24); Mays Dep. 15:19–16:2 (Dkt. No. 25 at 6).) Jackson was a frequent visitor to the jail and Mays had known him, prior to the incident, for five or six years. She estimated that she may have dealt with him on as many as a hundred previous occasions, but he had never before made inappropriate comments to her, nor was she aware that he had been sexually inappropriate with any other staff. (Mays Decl. ¶ 3 (Dkt. No. 24); Mays Dep. 57:12–16, 59:11–25 (Dkt. No. 25 at 9, 10).)

On May 10, 2004, Mays was working her first shift after having taken a two week vacation. At approximately 5:00 p.m., she was doing diabetic checks on the Seventh Floor of KCCF in the Intensive Management Unit ("IMU"), where Jackson was being held. (Mays Decl. ¶ 4 (Dkt. No. 24); Mays Dep. 50:6–9 (Dkt. No. 25 at 8).) The IMU provides housing for "difficult" inmates, as well as inmates with

---

"disparate treatment" theory, and in opposing the instant motion for summary judgment, Plaintiff appears to actually be proceeding under a "hostile workplace" theory. (*See* Pl.'s Resp. 8 (Dkt. No. 23).) Defendant does not object to the discrepancy between the theory pled and the theory pursued; therefore, the Court will consider the arguments that the parties make on the latter. It should be clear, however, that Plaintiff's failure to make any argument in support of her claim that she was subject to disparate treatment effectively abandons that course of argument, as well.

[2] The Amended Complaint actually discusses *two* incidents that occurred while Mays worked for KCCF—the sexual assault that provides the basis for her discrimination claim, and her experience months later being accidentally stuck with a contaminated needle during a blood draw. Mays' response in opposition to Defendant's summary judgment motion concerns itself almost entirely with the assault; although the needle incident is briefly mentioned in the statement of facts, it is not referenced again. The brief makes no attempt to draw any connection between the needle incident and Mays' claim for gender discrimination, and the Court's search of the record similarly failed to turn up any obvious connection between the two. It therefore appears that the needle incident was the basis of Mays' Intentional Infliction of Emotional Distress claim, which has since been withdrawn. (*See* Am. Compl. ¶ 5.2 (Dkt. No. 2 at 22).) Accordingly, the Court disregards this incident as irrelevant to the analysis of Mays' remaining discrimination claim and does not address it in the analysis below.

ORDER – 2

special medical needs. (Mays Dep. 54:14–17 (Dkt. No. 25 at 9).) Diabetic checks of inmates housed in the IMU take place through a "pass-through," an area in the door of the inmate's cell that, when opened by a guard, measures approximately eight inches tall and fifteen to sixteen inches wide; the pass-through is also regularly used by staff to exchange food trays or to handcuff inmates. (*Id*. at 56:11–57:9.) Mays estimated that on average, an inmate might be able to fit an arm and part of a shoulder through the pass-through. (*Id*. at 56:10.)

On this particular day, Jackson put his hand through the pass-through for Mays to prick his finger so that she could test his blood glucose level. In her deposition, Mays recalled that Jackson commented on the smock top that she was wearing, "[a]nd . . . he kind of grabbed the hem of my top and was feeling the material . . . . I remember commenting to him that, 'You better be careful. You'll get yourself in trouble.'" (Mays Dep. 50:17–23 (Dkt. No. 25 at 8).) The diabetic check revealed that Jackson's blood sugar was high, requiring two injections. Mays went back to her cart to prepare the first of the injections and when she returned to Jackson's cell, "he kind of grabbed my pants and . . . was kind of pulling me a little bit . . . towards the cell, and once again I pulled away." (*Id*. at 51:2–4.) Mays did not remember the exact sequence of events, but remembers that Jackson also "rubbed the . . . back of his hand against my pubic area." (*Id*. at 51:8–9.) Again, she warned him, "You're going to get yourself in trouble." (*Id*. at 51:9–10.) When she returned to give him his second shot, "he turned his hand over and actually cupped my pubic area and was running his hand back and forth at least a couple of times." (*Id*. at 51:13–15.) Mays backed away and went to the next cell to complete the diabetic checks in that area. (*Id*. at 53:11–16.) Then, she left the area and called the officer on duty to let him know what had happened. (*Id*. at 53:19–22.) The entire interaction with Jackson lasted approximately three minutes. (*Id*. at 53:8.) KCCF responded by issuing Jackson a disciplinary infraction and conducting an investigation, which led to the matter's referral to the King County Prosecutor's Office. (*See* Dkt. No. 25 at 37.) Jackson was thereafter charged and ultimately pled guilty to a felony sex offense. (*See* Dkt. No. 25 at 68.) He was sentenced to twenty-two months in prison for the incident.

ORDER – 3

Mays' complaint, however, is not with what *followed* the incident; rather, she charges that KCCF failed to take certain precautions that she believes could have prevented the incident entirely. (*See* Mays Dep. 70:8–71:10 (Dkt. No. 25 at 12).) Specifically, Mays complains of KCCF's failure to warn her that Jackson had been acting out sexually prior to May 10, 2004. It is undisputed that approximately one month earlier, Jackson had made lewd sexual comments to a nurse and a female officer. As a result, Jackson was infracted and received the maximum punishment for an infraction—ten days of disciplinary deadlock. (*See* Vicki Shumaker Decl. ¶¶ 5–7 (Dkt. No. 28).) Mays' contention that Jackson's attack on her was foreseeable, however, is not based on this incident alone. In addition, Mays cites the deposition testimony of Corrections Officer Melchor Cercenia who remembers being told at "pass-on"[3] at approximately 2:20 p.m. on May 10, 2004, that Jackson had a "history of grabbing females[.]" (Cercenia Dep. 19:9–14 (Dkt. No. 25 at 23).) Mays also claims that when she returned to work on the day after the incident, "I learned from other staff that in the two week period prior to this assault (while I was on vacation), Jackson had tried to grab other female staff and that he had been making sexually inappropriate comments to female staff[.]" (Mays Decl. ¶ 7 (Dkt. No. 24).)[4]

Based on the foregoing, Mays contends that Jackson's attack on her was foreseeable and that KCCF's failure to warn her about his prior behavior makes it liable for the hostile work environment that she argues resulted from the incident. Had she been warned, Mays claims that "I would have approached Jackson in a very different manner, including, specifically having a jail guard accompany me to his cell."

---

[3] Per Officer Cercenia, "pass-on" occurs prior to each shift at KCCF, where, concurrent with roll call, the officers going off duty "pass on" important information about incidents that occurred during the previous twenty-four hours. (*See* Cercenia Dep. 19:13–20, 36:15–20 (Dkt. No. 25 at 23, 27).) Officer Cercenia estimated that information about a particular inmate's bad behavior might be repeated at pass-on for three days, so that people who were not at work for the preceeding two days would be made aware of the behavior. (*Id*. at 38:8–16 (Dkt. No. 25 at 28).)

[4] King County has no records of Jackson making any attempts to grab anyone prior to the assault on Mays and Mays does not remember which staff members gave her that information.

ORDER – 4

(*Id.*)[5] "[A]t a minimum," she would have "halted the blood test when Jackson started flirting by commenting on her clothing." (Pl.'s Resp. 5 (Dkt. No. 23).)

Mays reports that, when she later heard that Jackson had been engaging in sexually inappropriate conduct prior to his attack on her, she "felt angry and unsupported[.]" (Mays Decl. ¶ 7 (Dkt. No. 24).) She returned to work, but "I was uncomfortable being there as I did not feel safe and I did not trust my co-workers or the administration to maintain a safe environment for me." (*Id.* at ¶ 9.) Then, in August 2004, she accidentally stuck herself with a contaminated needle while she was drawing blood from an inmate. The inmate would not agree to be tested for HIV, so as a precaution, Mays was put on a regimen of anti-retroviral drugs to prevent her risk of contracting the virus. (*Id.* at ¶ 10.) Side-effects of taking these drugs kept Mays out of work for a while, then panic attacks upon her return in October 2004 resulted in additional leave. (*Id.* at ¶ 11.) She never returned to work, and in April 2005, after she had utilized all of her family medical leave and had been granted at least five leaves of absence without pay, she was issued a non-disciplinary medical termination by King County. (Mays Dep. 93:13–18, 108:6–14 (Dkt. No. 14-2 at 32, 35); Kipp Ltr. to Mays Apr. 1, 2005 (Dkt. No. 14-2 at 60).)

## II. LEGAL STANDARD

As the moving party, Defendant King County ("the County") bears the burden of showing that there is no evidence which supports an element essential to Mays' claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). For an employment discrimination claim pursued under a hostile work environment theory, those elements are that "(1) [the plaintiff] was subjected to verbal or physical conduct of a sexual nature, (2) this conduct was unwelcome, . . . (3) this conduct was sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment," and (4) the plaintiff's employer was liable for the harassment that created the hostile environment. *Freitag v.*

---

[5] After the incident, the KCCF corrections officers apparently began escorting nurses when they provided medical services to inmates in the section of the jail where Jackson was being housed. (*See* Cercenia Dep. 31:7–16 (Dkt. No. 25 at 26).)

ORDER – 5

*Ayers*, 468 F.3d 528, 539 (9th Cir. 2006) (quoting *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002)). If the County is able to carry its burden, then Mays must "set forth specific facts showing that there is a genuine issue for trial" in order to survive summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Because, in an employment discrimination case, ordinarily "the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record," a plaintiff pursuing such a claim "need produce very little evidence in order to overcome an employer's motion for summary judgment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (quoting *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000)). Moreover, as with any summary judgment motion, the Court views all factual inferences in the light most favorable to the non-moving party, meaning the Court will accept all of Mays' allegations as true and resolve any conflicts in her favor. *See, e.g.*, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In addition, the Court does not make credibility determinations with respect to statements in affidavits or depositions, nor does it weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).

Finally, because "Washington sex discrimination law parallels that of Title VII, . . . it is appropriate to consider [plaintiff's] state and federal discrimination claims together." *Little*, 301 F.3d at 966 (citation omitted). *See also Anderson v. Pac. Mar. Ass'n*, 336 F.3d 924, 925 n.1 (9th Cir. 2003) (explaining that WLAD "tracks federal law," and thus the court's analysis, although citing only federal law, "applies with equal force to the Plaintiffs' claim under Washington law").

### III. ANALYSIS

A hostile work environment arises when unwelcome sexual conduct "unreasonably interfer[es] with an individual's work performance or creat[es] an intimidating, hostile, or offensive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) (quoting 29 C.F.R. § 1604.11(a)(3)). Employers are liable for harassing conduct by non-employees "where the employer either

ORDER – 6

ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct." *Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997). *See also* 29 C.F.R. § 1604.11(e) ("An employer may . . . be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action.")

The County contends that Mays' hostile work environment claim fails on two accounts. First, citing *Brooks v. City of San Mateo*, 229 F.3d 917 (9th Cir. 2000), the County argues that "a single groping incident" is not sufficiently severe to support a hostile work environment claim. The Ninth Circuit, however, was careful to distinguish the circumstances in *Brooks*, which involved the first and only incident of fondling by a co-worker, "from one involving a series of incidents, *which the employer knows about and does nothing to correct*. In such circumstances, the non-action by the employer can fairly be characterized as acquiescence, i.e., having changed the terms and conditions of employment to include putting up with harassment[.]" *Id*. at 924 n.4 (emphasis added). As Mays takes no issue with the County's response to her assault, her hostile work environment claim necessarily relies on her contention that the County knew or had reason to know of prior behavior on Jackson's part and its failure to warn her of that behavior is the "acquiescence" that would give rise to its liability here. Because Mays is proceeding under a theory that her assault was merely the final incident in a series of incidents which the County knew about, Defendants' reliance on *Brooks* is misplaced.

The County's second argument—that Mays is unable to demonstrate that it can be held *liable* for the incident—is more persuasive. The County contends first, that Mays cannot prove that it was on notice that Jackson had assaulted other female staff. Mays contends that her testimony on this point, "that several staff persons told her they were aware of Jackson's sexual misconduct," together with Officer Cercenia's recollection that he was warned about Jackson at pass-on mere hours before the assault, suffices to raise "a material issue of fact whether the harassment by Jackson was pervasive enough [that]

ORDER – 7

the jail should have known they needed to take strong remedial action." (Pl.'s Resp. 12 (Dkt. No. 23).) In response, the County argues that this evidence amounts to nothing more than uncorroborated hearsay, not properly considered at summary judgment, and further emphasizes that, "[d]espite having the opportunity to conduct months of discovery, Plaintiff has not come forward with any witness who has direct personal knowledge that Jackson sexually [] assaulted any other staff-members in the two weeks preceding May 10, 2004, *or* that King County failed to act on such alleged misconduct." (Def.'s Reply 8 (Dkt. No. 27)) (emphasis in original).

Although as an employment discrimination plaintiff, Mays need present very little evidence in order to survive the County's motion for summary judgment, she remains subject to the requirements of the Federal Rules. Specifically, when responding to a properly supported motion for summary judgment, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e)(2). Moreover, such affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." FED. R. CIV. P. 56(e)(1).

The Court agrees that testimony by Mays and Officer Cercenia as to what they were told by others about Jackson's activity is inadmissible hearsay when offered to prove the truth of the matter asserted—that is, whether Jackson had, in fact, engaged in ignored and unremedied sexually harassing behavior in the weeks that Mays was on vacation. *See* FED. R. EVID. 802; *see also Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001). It is clear from both Mays' declaration and the documentation related to Officer Cercenia's recollection that neither has personal knowledge of any such activity by Jackson and, even after the completion of discovery, the source of this information remains unclear.

Thus, in total, Mays has presented the following competent evidence that the Court may consider in determining whether KCCF had actual or constructive knowledge that gave rise to some duty to warn

ORDER – 8

Mays that Jackson might pose a threat to her during a diabetic check conducted through a pass-through window. First, although Mays references an incident in 2003, when Jackson apparently exposed himself to a female officer (*see* Roe Decl. ¶ 3 (Dkt. No. 25)), she offers no further information about this incident, nor does she argue that the County was under an obligation to inform her about it or that knowledge of it would have prevented the assault. In addition, nothing in the record would indicate that the County failed to take action following this incident—while it is unclear whether Jackson was housed in the IMU for medical or disciplinary reasons (or both) the fact remains that his interaction with staff was significantly restricted by the pass-through window. Second, it is undisputed that Jackson made lewd comments to staff approximately one month prior to his assault on Mays. However, it is similarly undisputed that KCCF responded quickly and deliberately to that incident, assessing the highest possible punishment against him.

Thus, Mays' argument that KCCF ratified or acquiesced in the harm that would befall her by not taking immediate and/or corrective action when it had reason to know of Jackson's behavior is necessarily reliant on the unsubstantiated rumors about incidents that allegedly occurred during her two-week vacation. If Mays were able to offer any admissible evidence that could support a finding that these incidents did in fact occur, then both her testimony and Officer Cercenia's testimony about what they heard about these incidents might well be admissible for the limited purpose of demonstrating that KCCF had *knowledge* of them. However, none of the cases that Mays cites can be read to stand for the proposition that an employer can be held liable for acquiescing in behavior where the plaintiff has been unable to put forth any admissible evidence that would tend to prove that the behavior did, in fact, occur.

Although Mays need not produce much evidence to survive KCCF's motion for summary judgment, failure to present any competent evidence that would support a finding that these incidents actually took place, is insufficient. Accordingly, the Court GRANTS Defendant's motion for summary

ORDER – 9

judgment on Mays' sole remaining employment discrimination claim.[6]

## IV. CONCLUSION

The Court hereby GRANTS Defendant's motion for summary judgment (Dkt. No. 14), and DISMISSES Plaintiff's employment discrimination claim for the reasons discussed above. Plaintiff concedes to the dismissal of the other claims contained in the Amended Complaint. There being nothing left for the Court to decide in this matter, the Clerk shall close the case.

SO ORDERED this 14th day of August, 2008.

John C. Coughenour
United States District Judge

---

[6] Because the Court finds that Mays fails to offer sufficient evidence to survive summary judgment on her hostile work environment claim, it need not reach Defendant's argument that the claim is barred under Washington's Industrial Insurance Act.

ORDER – 10